## MAYTAG CO. v. BROOKLYN EDISON CO., Inc.

### No. 6888.

District Court, E. D. New York.
July 17, 1935.

See, also, (D. C.) 3 F. Supp. 742.

Wallace R. Lane, of Chicago, Ill., Oscar W. Jeffery, of New York City, Clarence J. Loftus, of Chicago, Ill., and John F. Ryan, of New York City, for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds, of New York City, George I. Haight, of Chicago, Ill., Walter H. Free, of New York City, and Edgar F. Beaubien, of Chicago, Ill., of counsel), for defendant.

BYERS, District Judge.

This cause involves patent No. 1,866,779 issued to the plaintiff corporation July 12th, 1932, upon application filed by Howard F. Snyder deceased on June 14th, 1922. The plaintiff is the assignee of the applicant, and for convenience reference will be made to the grant as the Snyder

patent. It has to do with a washing machine referred to as the Maytag.

The defendant corporation is an inhabitant of this district, and is being sued in this court because it has heretofore sold three competing machines known as the Easy, the A. B. C. and the Thor.

No jurisdictional or other questions not touching the merits are presented.

A comparison of the plaintiff's machine and those said to offend, as supplemented by the testimony, reveals unmistakably that there is no fundamental difference between them. The mechanisms, method of operation, and physical characteristics are in such close resemblance, that the issue of infringement presents no problems.

The one matter relied upon by the defendant, to avoid infringement, is the shape of the base of the impeller, or agent for agitating the water in which the washing is accomplished. That is not controlling, and will be discussed in connection with the claims.

The issue seriously made is as to validity, and that is presented in dual. aspect, namely: That the machine does not function according to the specifications and claims; and if it does, the patent is void for lack of invention.

Understanding of the controversy requires that something be said of the course of events in this industry, since the plaintiff's machine was put on the market in 1922. By that time and as the result of efforts which had persisted for over ninety years, washing machines had come to occupy an important place in the domestic economy of the country. The courts have spoken of their contribution to the general good. Iowa Washing Machine Co. v. Montgomery Ward & Co. (D. C.) 227 F. 1004, affirmed (C. C. A.) 234 F. 88. The mitigation of the rigors of a prosaic task, which was their purpose, has been a constant challenge to inventive skill, from 1809 when the first patent for such a machine was granted, until the present time.

The successive types have been known as the rubboard, the peg-dolly (having pegs, and later blades, to rotate or oscillate the fabrics against corrugations in tubs), the oscillating type (to tumble the fabrics against ribs or corrugations), the cylinder type having a like purpose, and the so-called vacuum-cup type to press the fabrics and squeeze them against the tub bottom. The two latter were making headway against the peg-dolly type, between 1915 and 1920, although the latter was probably in greatest distribution during those years.

The washing of fabrics requires that the deposit of foreign substances which find lodgment in the meshes, and in the interstices of the threads themselves, shall be overcome and the substances removed. Soapy hot water loosens the particles so engaged, but as these lack migratory properties, expulsion can be accomplished only by deforming the threads, and hence the fabrics. The testimony to this effect is uncontradicted.

That is the requirement to be met in devising a substitution for manually rubbing, squeezing, twisting and manipulating the fabrics, when in the soapy water, which precedes rinsing in clean water. It will be seen that the manipulation cannot be avoided, but if the means of accomplishing it can be mechanically applied, the energy required for manual application can be released for different and more congenial manifestation.

It is unnecessary to portray the operations of the various types of washing machines which preceded the Maytag in point of time; the fact is that they consisted in so disposing mechanical agents in a closed container or wash tub that the necessary deformation of the threads of the fabrics being washed was undertaken by subjecting the fabrics to contact with ribs or corrugations or similar obstacles contained in the tub itself.

In the peg-dolly type, which consisted originally of a disc having three or four projecting pegs (so that it looked like a small milking-stool) held in central position by a shaft, the clothes were engaged by the pegs, and the mass was rubbed back and forth by half rotation of the dolly, first in one, then in the reverse direction, and the clothes nearest the walls of the tub were rubbed against it and themselves. In this operation, the mass had frequently to be rearranged through the application of a washing stick. That meant that the cover had to be opened, as occasion required, and heavy wet articles lifted and rearranged.

The operation of the peg-dollies was rigorous, which meant heavy wear and tear.

In some models, the pegs were succeeded by blades which were not quite so deep

as the length of the pegs, but they were substantial in construction, usually arranged radially, and in section they were usually triangular.

These blades performed the same office as the pegs, but admitted of somewhat automatic displacement and movement of the materials being washed, because they tended to slip over the blades instead of being rigidly held as by the pegs.

The diameter of the disc was usually less than that of the tub, but there seems to have been no constant relation of those respective dimensions.

The contra movements of the disc and its projections agitated the water, which gave rise to the necessity for keeping the top of the tub closed. This condition of turbulence being inevitable was accepted but not apparently recognized as a factor in the washing operation, except in the instances later to be noticed.

The asserted contribution of the Snyder patent was the departure from the understanding current in 1920 or thereabouts, that washing machine technique required for its success, a method of rubbing the clothes against projections within the tub, so as to duplicate the process involved in the manual use of a scrub board or wash board, when washing was accomplished entirely by hand, and substituting for that, a process of contorting the fabrics mainly by water action, so that the deformation of the threads and the consequent dislodgment and migration of foreign particles from the meshes and the threads themselves, would be accomplished, without subjecting the fabrics to the heavy wear and tear previously encountered.

Such is the teaching of the Snyder patent, stated in simple language, and the defendant has undertaken to prove that the machine does not function as the patent says it does.

The Maytag machine consists of a tub, in the bottom of which is a power-driven impeller called a gyrator, consisting of a disc substantially less in diameter than the tub, having a cone-shaped center, and upon the disc are mounted four radially disposed blades. This impeller is oscillated at a speed not specified in the patent, so as to set in motion opposed currents of water which establish a flow outward from the bottom center of the tub, upward at the sides to the surface of the water, and back to the center and down to the inner portion of the impeller blades. The fabrics being washed, if the mass is not too great, follow that course, turning over constantly. The water is hot and contains soap, and at the end of ten minutes more or less, the fabrics so treated, are cleansed.

The success of the operation is not questioned, but the controversy is as to how it is accomplished; the defendant contends that the impeller is, in effect, the peg-dolly in a different form, and that the result is obtained in the Snyder machine as it was in those of the earlier forms of construction, and that the patent tells one story and the machine acts another.

The Maytag device was put on the market in 1922, and substantial sales were made in that year; subsequent commercial success has rewarded the plaintiff so that down to the trial, some 2,000,000 machines had been sold, of which 172,000 were of the type illustrated in the patent, and the balance were of the high center post type later adopted. That element is conceded not to affect the issues here involved.

While comparatively little advertising was done down to 1925, the creation and maintenance of channels of distribution were naturally accompanied by increasing publicity, and large sums came to be expended in later years.

At the outset the dealers were skeptical concerning the claims of the plaintiff that the machine so operated as to wash clothes by water action. Competitors who were then selling the various types of machines above noted, did what was to be expected in fostering that skepticism. It is not contradicted that the plaintiff's machine was referred to in trade circles as an ensilage cutter, and was otherwise derided both by dealers and salesmen from competing manufacturers.

Contemporaneously, two of the latter, the A. B. C. Company and the Easy Company, acquired Maytag machines for the information of their experimental staffs.

In about 1925 and 1926 competitors' machines appeared upon the market of the same type as the Maytag, that is, they had a bottom-positioned impeller, power driven, and of the same general appearance, and the same claims were made for them in pamphlets issued by the manufacturers, as were made by the Maytag Company, namely, that in these machines, washing was done by water action, with a resulting saving in time, and wear and tear upon the fabrics.

That condition has continued to prevail down to the time when this suit was started.

The assertions in all the advertising matter, and there is a substantial bulk of it in evidence, are flamboyant and unrestrained to the effect that the A. B. C., Easy and Thor washing machines, do their work by water action, etc. The importance of these representations lies in the fact that the manufacturers who made them may be thought to have intended to induce prospective purchasers to believe them to be true.

On these manufacturers' behalf, this defendant takes the position that all such assertions, both of the plaintiff and of its competitors, are untrue. The defendant itself distributed some of these pamphlets but professes not to be embarrassed by that fact.

Of course, the legal issues are not to be controlled by sales patter, but when advocacy is confronted by advertising from its own camp, its objectives forfeit something of access.

It is asking much to suggest that the court should close its eyes to the repeated assertions of those who are not in the remote background of this contest, and which are directly at variance with the arguments now made by defendant's counsel.

The foregoing is intended to portray a practical aspect of the controversy which has been waged in this court over the plaintiff's patent.

■ Sight has not been lost of the right of the competing manufacturers to copy the plaintiff's machine in all substantial aspects, and to compete with it on its own ground, if the plaintiff's device is simply the embodiment of teachings of an earlier day (than June 14, 1922), which were then at large.

Certain aspects of the case stand out clearly:

The Maytag machine has been commercially successful, and washes clothes satisfactorily.

The patent was pending for over ten years, during which there was one interference proceeding that went to the Court of Customs and Patent Appeals [Unruh v. Snyder, 49 F.(2d) 1038; decided June 1, 1931] and another was attempted without success. During these years there were many amendments to the specifications and claims.

It is the defendant's task to overcome the presumption of validity, which gains something from the unusual stress and strain of so searching a process as attended the final grant of letters.

It is necessary now to examine the Snyder patent at close range.

The specification recites the inventor's objects as being to provide a novel construction designed to wash and cleanse clothes, fabrics, and the like, including those of delicate texture which would suffer if subjected to the rigors of ordinary washing machines or even washing by hand. It is said "By reducing friction on the articles to be washed the life of the article is preserved."

In part the objects are attained by associating the tub and gyrator and by so operating the latter "that the weight of the articles does not interfere with the gyrator or its action, or with the tub and its co-action with the gyrator." The latter may be at the top or bottom of the tub, but has always been bottom-positioned in the Maytag machines.

The articles to be washed are suspended in the soapy water during the operation so that the alternating rotary movements of the impeller called gyrator do not interfere with the latter and so sustain damage while they and the water containing them are "turbulently swirled or whirled about with a surging or seething movement within the tub."

The drawing shows a bottom-positioned gyrator, and in that type of construction it is said that the impeller action on the water is to "constantly press the clothes upwardly in a swirling formation so that they are maintained in substantial suspension in the liquid above the blades."

The tub is smooth, i. e., without corrugations, etc., and as shown the bottom is inclined upwardly on both sides adjacent to the impeller "so associated" with it and with the rest of the tub "as to cooperate therewith in aid of such action."

One object of the invention is to provide the method of and apparatus for such cleansing without bringing the fabrics "into substantial rubbing contact" with the tub or the impeller.

Another object is to provide flanges or blades to the impeller to impart the characteristic movement to the water and

clothes which has been described, while a rotary or gyratory movement thereof results from the alternating rotary action of the impeller, the water and clothes being driven around the tub first in one and then the other direction. The paths of the water and clothes are called devious; the vigorous agitation of the water prevents the clothes from being injuriously affected by the "gyrator operating or actuating mechanism," which latter can be disconnected.

The new method of washing is described as being accomplished by the action of the water itself on the materials, "as distinguished from their being rubbed or drawn through the water by a dolly or other mechanism, or tumbled against the sides of the tub or rubbed against projections on the interior of the tub."

The water is said to drive and swirl the clothes about the interior of a smooth tub avoiding "substantial contact" with the tub or gyrator; the water movement "largely prevents" rubbing the clothes against the tub or the impeller, whereby deterioration of the materials washed is eliminated.

The patentee says it is difficult to explain all the advantages because of the unusual water movement.

The gyrator is defined as an alternating rotary member operable to effect movement of fluids and materials from the central portion thereof to its outer edge.

Reference to the drawings is extensive and comprehensive. The patentee says that he shows a bottom positioned impeller, but also comprehends one depending from the top of the tub, whereby the characteristic flow heretofore described, would be reversed in direction (not referring to the circulatory currents however).

The gyrator is annular, dish shaped as shown, "the central or inner portion of which merges in a continuous concave curve into a central upstanding stem portion 53, which terminates in an upper rounded end. The outer peripheral edge of the trough-like portion 54 extends outwardly and upwardly in a concave curve 55, which is continuous with the dished curve of the portion 54." The blades or flanges are vertical, and incline from their outer edges to the trough-like portion of the gyrator, extending half-way up and merging into the center stem. They are of "substantial height" so as to project well into the water of the tub. They are lobe shaped, extend considerably above the dish shaped member (disc) to provide sufficient blade surface "to impart a considerable force or throw to the water" outwardly and somewhat parallel to the axis of rotation of the gyrator.

The curve upward of the dish assists this water movement, which is also augmented by the inclined adjacent walls of the tub.

It may be convenient to pause sufficiently to observe that the assistance and augmentation so referred to, are not deemed essential features of the disclosure, by this court. The water movement is initiated by the blades, and is almost equally present according to the testimony, when the flat disc model is employed in a tub which does not contain walls which incline upwardly adjacent to the impeller.

So much of the specification as relates to the power and coupling is not presently material.

The recital continues that when the gyrator is alternately rotated (in practice about 225° is the extent of rotation) or oscillated, the water and materials are given the outward, upward, inward and downward movement previously stated. The materials being washed are said to be given "a quick, snappy, sieving, whirling, reversing double action, produced by the gyrator, doubling the clothes first one way and then the other until every thread in the fabric is acted upon an untold number of times, somewhat like the cracking of a whip-lash in all directions." Again it is said that it is difficult to describe the action of the water and the clothes produced by the rapid reciprocation of the gyrator, whereby cleansing is accomplished while the materials "are held in suspension" by the peculiar and novel movement and action of the water. In spite of this the patentee thinks that anyone skilled in the art can readily construct and operate the invention and utilize the method disclosed.

The offending machines constitute a tribute to that prophecy, although it is now said that they are embodiments of earlier teachings.

The claims in suit are the following:

"23. A washing machine comprising in combination, a tub for containing cleansing liquid and materials to be cleansed, said tub having a bottom portion and an up-

wardly extending wall portion, the interior surface of which is free from rubbing projections, a rotary reciprocatory impeller mounted in the tub adjacent its bottom, having a base and a plurality of blades, each of which is of substantial height and lateral area, and a central portion projecting upwardly from the base, the upper surface area of the base being considerably less than the horizontal cross-sectional area of the tub through its upwardly extending portion, the margin of said base being spaced a substantial distance away from the upwardly extending portion of the tub, said tub and impeller being so constructed and positioned relative to each other that when the impeller is rapidly reciprocated each blade and its adjacent portion of the impeller base will simultaneously drive the cleansing fluid in one and then an opposite outward upward circulatory direction toward and around the clothes, and act in cooperation with the interior of the tub to cause violently flowing opposed currents of liquid to meet and flow inwardly and downwardly toward the central portion of the tub, and substantially suspend the materials in the fluid while being washed, a rotary reciprocating drive shaft extending upwardly through the bottom of the tub into the interior thereof for supporting the impeller for movement in a fixed plane, and power means for rapidly reciprocating the shaft and impeller for the purposes set forth."

"26. In a washing machine for cleansing fabrics by forcing cleansing fluid through them while substantially suspended by the action of the fluid, as distinguished from pulling or pushing the fabrics through the fluid or against scrubbing forces, or otherwise scrubbing them by mechanical means, a tub, a substantially imperforate rotary reciprocatory impeller mounted to operate in a fixed plane having blades of substantial height and area projecting therefrom in a direction toward the fabrics while they are being cleansed, said tub and impeller being so constructed and arranged as to cooperate while the impeller is in operation for whipping the fluid and violently forcing it outwardly, upwardly and in a general vertical and circulatory movement and circumferentially of the tub first in one and then in an opposite direction and through and around the materials, and substantially suspending the materials in the fluid while being washed, and power means for rapidly reciprocating the impeller."

"38. The method of washing fabrics by forcing cleansing liquid through and around them while substantially suspended by the action of the fluid, as distinguished from pulling fabrics through the fluid against scrubbing corrugations, or otherwise scrubbing them by mechanical means, comprising immersing the fabrics in a washing fluid in a container, then vigorously and rapidly impelling the washing fluid in one and then in an opposite outward circulatory direction away from the plane of the source of impulsion and through the fabrics and circumferentially along the interior of the container in rapid succession, and causing these violently opposed currents of fluid to meet and flow inwardly and toward the central portion of the container, and toward the source of impulsion thereby substantially suspending the fabrics in the fluid and cleansing them while thus suspended."

The principal assault upon this patent as has been stated is, that the Maytag machine does not function in accordance with the recitals, or the claims; that the materials are not held in suspension near or over the blades, but are actually battered by them, and are dragged back and forth in the water, precisely as was done by the peg dolly type of washer; and that the required squeezing, release of pressure and rubbing are administered by blows struck by the impeller. That in effect the same things are done to the fabrics by the impact of the impeller blades, as was first done by hand in remote times, and latterly by the machines prior to the Maytag.

It is not easy to observe how any of these machines really does function. Demonstrations in the court room in glass tubs, so illuminated as to reveal all that the eye can perceive, yielded little which can be stated precisely.

In clear water, tracer cloths alone, if few in number, showed that the course of flow described in the patent does take place, and that in addition there is a constant turning called roll-over of the tracer; the whiplash was not always easy to see, but there was a flexing and doubling back of the fabric as it moved in and around the tub.

When numerous articles were added, the movements were more difficult to follow.

As to the tracer, it worked out, up, back to the center and down to the region of the impeller blades, and while there re-

ceived an impulse that made it continue the journey; whether it was actually struck by the blade, or was caused to move by the motion imparted to the water by the blade, was too close a thing for convincing observation.

On this subject it must be stated, that to liken the effect of the impeller blade upon adjacent fabrics, to the pounding of clothes upon a rock practiced in primitive days, is to fail entirely to distinguish between an under-water thrust and a blow delivered out of water. The force of the motion of the impeller blades is largely expended in moving the water in which the impeller is immersed, and while there is seemingly an observable contact between the fabrics and the impeller when even a normal or capacity load of materials is treated, the actual striking energy of the blade is obviously inconsiderable. No effort whatever was made by the defendant to cause it to be stated in terms of force or power, nor is it apparent how that could have been contrived.

That there was dragging, i. e., temporary engagement by blades with elements in such a load as the Maytag machine was designed to handle, is true, but it was not continuous, and did not impede the roll-over movements of the materials in the course described.

To say that the clothes were suspended, that is, maintained horizontally or otherwise out of any contact with the impeller, would be untrue. The articles did turn over and flex back and forth, and did flutter as the experts have it, and there was no perceptible rubbing against as distinguished from movement along, the smooth interior of the tub. The fabrics did not move outward *above* the blades, but from down between them.

The defendant objects to the limitation expressed by the patentee in saying that there is no *substantial* contact with the impeller, and that the clothes are cleansed while they are *substantially* suspended, and yet after carefully observing the operations of the Maytag and the challenged machines, one would be hard put to devise apt words to portray an impression which at best is incapable of statement in exact terms.

Tests were made to demonstrate that if fabrics were kept out of contact with the impeller, they were not cleansed. That is true, but the preventive agency in each case also rendered impossible the necessary contortions of the fabrics which may well contrive the deformation of the threads requisite to the eviction of the foreign particles from their interstitial lodgings; once dislodged, they can be borne away by the force of the contending currents set in motion by the impeller.

The presence of lint in the water after a period of operation was clearly shown, but that is not incompatible with a cleansing process such as the claims describe. Perhaps it goes beyond the promise of a washing operation which "eliminates the deterioration of materials being washed by it" as the recital proclaims, but that pertains to the result, *not to the thing which is done.*

In the absence of a comparison of the percentage of lint found in the water of a Maytag machine, and a like result following the washing of the same materials in a peg dolly machine, it cannot be concluded that identical traumatic incidents characterize the two operations.

The defendant is satisfied that it is impossible to wash fabrics in the Maytag or the other machines according to the teachings of the patent, and that therefore such washing does not take place.

The court is not satisfied that this negative has been proven. It inclines perceptibly to the view that the Maytag machine washes fabrics, when not overloaded, perhaps not with mathematical fidelity to the tuition of the patent, but with sufficiently close adherence thereto, to justify the conclusion that the water action created in the machine of the patent plays a far more important part in the final result, than in machines which it superseded and which depended upon rubbing the materials against corrugations and ribs of the tub through the agitation of the peg-dolly. The impression persists that Snyder's was a new step, an advance beyond the latter machines, in that the water action became the major factor in the operation, and so functioned as to distort and manipulate the fabrics and thereby to cause deformation of the threads and if this was aided by such contact with the impeller as does take place (Snyder did not teach its absence) the latter is the subordinate and not the dominant phase of the accomplishment. Certainly there is no such thrusting of the fabrics against the tub, as it was the office of the peg dolly or the bladed dolly to accomplish.

Before leaving this aspect of the discussion it is proper to add that fabrics are not cleansed by flowing water over them, nor by forcing it between the meshes. Experiments to that end do not aid in reaching a conclusion. The deformation of the threads is essential and when the patentee stated that his machine so operated that "every thread in the fabric is acted upon" he demonstrated a knowledge of the essential nature of the problem he had undertaken to solve.

When he said that he caused the several threads to be acted upon as the result of the interplay of the opposed currents of water upon the fabrics, which were set in motion by the impeller as he described, he made a statement which has not been disproved by the evidence in this case.

█ Passing now to the other aspect of the defendant's major assault upon the patent, namely, that it lacks invention, it becomes necessary to consider the constituency of the art as revealed in June of 1922.

The customary deference thereto commonly proclaimed under comparable conditions, need not obscure the fact that none of the accused machines measurably approaches any of those described in the patents relied upon by defendant.

Hermance, No. 88,478 (1869).

This is a wash-boiler, having a perforated wheel at the bottom, of almost the diameter of the container. On the wheel are several hollow U-shaped radial ribs, open at their outer ends. The clothes are laid upon the wheel, and the latter is reciprocated from above the cover in half circles, by a handle connected with a center shaft. The patentee says the suds are tremendously agitated, the water passing through the tubes or ribs centrifugally, and then it rushes in again through the outer ends and perforations."

The defendant operated by hand a machine which it bought from a user, and asserts that the characteristic course of flow was so produced. If so, the court could not observe it.

The defendant's witness who owned the machine said the inside, by which was meant the wheel, had not been used for thirty years. That the tub *was* used to boil clothes in. Also that the clothes were rubbed by the dasher against the tub, which was later modified by her statement that she could not see what took place when the tub cover was on.

The abandonment of the agitator, in favor of boiling clothes with the help of washing powders, is practical evidence that the machine did not give continuous service according to its patent. The latter did not teach thread deformation as the result of a contortion of the fabrics through the interplay of effective water currents. There is nothing in the patent to indicate that Hermance regarded this as a desirable accomplishment. Hermance did not anticipate Snyder.

Morse, No. 106,853 (1870).

This patent apparently discloses a machine intended to wash clothes by water action, for the tub contains no ribs or corrugations. There is a bottom positioned dasher somewhat smaller in diameter than the tub. The disc supports a series of four prismatic arms disposed so that each projects to the rim, as shown in Fig. 1. The height of these arms is not stated. A center structure supports a circular series of round bars rising to a disc near the top cross bar. The dasher is reciprocated by two hand-operated handles at the top.

The patent states, referring to the risers, "Their purpose is to aid in washing the clothes, and imparting to them reciprocating rotary motions within the tub G, within which the dasher is arranged, and to which it is pivoted, so as to be capable of being moved therein with a reciprocating rotary movement by a person" holding the handles.

The arms are said to aid in preventing the clothes from moving toward and piling about the shaft, as the centrifugal force "generated in the water and tending to throw it upward at the sides of the tub, will be met and counteracted by lateral currents or forces induced in the water by the arms."

The improvement claimed is the disc and the series of bars arranged with mutual reference, and with the shaft to which the handles are fixed.

The defendant's expert says that this machine operates by pounding, rubbing and dragging of the clothes by the disc.

The disclosure of this patent is a triumph of reticence. If the patentee had discovered anything he was careful to conceal it. He merely built a structure, described its essential elements and their respective relative positions, and said that the arms would function as quoted above.

The operation of a reproduction of this machine by hand power in court was said to result in producing the turnover of clothes and the characteristic course of flow found in the Maytag and accused machines. Perhaps it did, but the patentee taught nothing of the kind.

There is no reason for believing that he suspected the necessity for thread deformation, nor is there any proof that clothes were successfully washed in his machine as he built and described it.

The best that can be said for Morse is that he believed in the efficacy of water action for cleansing clothes; it has not been demonstrated that he taught how to accomplish it. To declare Snyder invalid on Morse's disclosure could be justified only by attributing to the latter many things which do not appear in the patent.

Foster & Garrison, No. 832,787 (1906).

This is an attempt to provide a washing machine in which the fabrics are cleansed by water action, that is, the rebound of water from the sides of a cylindrical shaped tub, which sides constitute an independent unit or shell; the latter is so constructed as to present a circle of triangles the alternate apexes touching the interior of the tub. The water action is created by a bottom positioned impeller, having no supporting disc, and the oscillation or rotation thereof causes the water to move outward toward the triangular surfaces, from which "said water is reacted against and through the clothes."

The defendant argues that this action is not possible, but that for present purposes the patent must be construed as though it were.

How a concededly false premise can lead to any helpful conclusion is not demonstrated.

It has been said above that the mere forcing of water through meshes, does not accomplish the necessary thread deformation, and probably further comment on this patent is unnecessary.

In contrast to the Maytag machine, the Foster and Garrison device is not shown to have washed clothes, either in accordance with the statements in the specifications or otherwise. Whatever else this patent may be, it is not an anticipation of Snyder.

Davis, No. 1,240,826 (1917).

This machine contains an oscillating, disc-shaped agitator, of wood, to float on top of the fabrics being washed. Disposed radially upon the under side of the disc are eight ribs or vanes extending from the rim toward the center; six are shorter than the other two, all are beveled at their inner ends, and the center of the disc is unoccupied. The objects to be attained were the creation of a water flow, generally opposite to that of Snyder (in the position shown in the drawing), by the action of the ribs, while the latter also "rub lightly upon the fabrics without injuring them."

The water is said to "force its way through the fabrics" creating the described circulation. "Thus the fabrics will be thoroughly cleaned without being pulled and distorted, the circulation of water through the fabrics resulting in the removal of dirt therefrom. In addition to the foregoing the ribs will act as rubbing elements inasmuch as they will engage lightly with the fabrics thereunder."

The claim is for the combination with a tub of the described disc, adapted to create the flow as stated, and a driving shaft, the disc being movable vertically.

Davis taught washing by a combination of rubbing lightly the fabrics, by the ribs, with water flow which would contribute to the desired result. It is not easy to visualize the action of the Davis machine as other than an engagement of the fabrics by a top-positioned set of blades, and an indefinite kind of change in the mass of fabrics caused by the agitation of the water, but the proportionate contribution of the latter, to the actual cleansing is not clear from anything that the inventor says. Thread deformation through water action is not even suggested.

The Davis patent was not thought to anticipate by the Patent Office, and that view is shared by this court.

Doughty and Davis, No. 1,496,305 (filed April 8, 1922).

This is a machine having a bottom-positioned agitator, of a diameter slightly less than that of the tub. Triangular vanes or ribs are arranged radially from the center, extending almost to the rim of the agitator. The height is not given. The invention claimed was that of having these vanes spaced unsymmetrically, i. e., there is a greater distance between two of them than between the others which are spaced equally apart. The object of this was to create an inequality of currents set up by

the oscillation of the agitator, for the purpose of preventing clothes which were being washed, from adhering to the top of the agitator. The patent says that a marked tendency was present if the vanes were equally spaced, "for a single one of the many pieces * * * in the tub to cling to the agitator, an action which interferes seriously with the efficiency of the machine in washing." The three claims are specific on this point.

If the device did not work with equally spaced vanes, it is hard to see how Snyder was anticipated, for his device does so operate; if unsymmetrical arrangement of the vanes had to be resorted to, the difficulty to be overcome must have been peculiar to the Doughty machine, but its elimination, if accomplished, did not result in teaching what Snyder taught.

Freeing the materials being washed, is not the same as deforming the threads through the rapid and vigorous currents set up in the Maytag machine.

Defendant's expert says that the washing effect under this patent is produced by squeezing and dragging and that the rubbing effect is greater than in the Maytag.

The defendant's argument is again, that this patent must be regarded as anticipatory of Snyder, because it professes something which it does not accomplish. The argument contains its own answer.

### British Patent to Jardine, No. 18,202 (1891).

Clearly this patent, as such, has no bearing on this controversy, for it relates to a device for preventing materials being washed, from slipping under the bottom of a disc, having blades, and capable of being either rotated or oscillated, and placed in the bottom of a tub. There are ribs on the tub, and defendant's expert says that the clothes are rubbed against them if the disc is rotated, but not if it is oscillated. It is pointed to by the defendant as indicating that such an impeller as Snyder contrived, was known in Great Britain over 40 years ago. Perhaps it was, and perhaps the Jardine device was sold in commerce, and perhaps when coupled to a motor it can be made to oscillate, and create the appearance of functioning as to any of the machines now being examined.

The patent however is quite silent upon the whole subject, and the manufacturers of the challenged machines did not adapt the machine of the Jardine patent to their own purposes.

One can read the Jardine patent closely and often and yet not find any teaching whatever of a device to perform the operation of washing according to what Snyder says he invented. Jardine's instruction was of a means to prevent the mangling of fabrics beneath the disc. The presence of the ribs in the tub, and the necessary squeezing of fabrics against them by the blades of the agitator, are too clearly indicated by this patentee to admit of misunderstanding.

### French Patent, Henin No. 363,514.

This is a patent for a washing machine consisting of a tub having corrugations, a bottom positioned agitator built of crossmembers (slats) so constructed, according to the drawing, that there is ample spacing between the slats; the agitator is pierced from below by a hollow tube containing a shaft which oscillates the agitator, manually or mechanically.

The agitator is circular, its diameter being only sufficiently less than that of the tub to permit of clearance. The agitator carries vanes and ribs radially arranged which do not extend laterally to the periphery, and these ribs and vanes, or perhaps only those which extend vertically, contain three apertures, and the office of the agitator is thus described in paragraph 4 of the "Resume":

"4. An interior disc comprising crossed wooded slats, in combination with wings and ribs, for the purpose of preventing the batch of linen from becoming packed at the bottom of the tub."

None of the other paragraphs discusses the washing, or the means whereby cleansing is accomplished.

The Henin machine is more like the four structures which are the subject of this cause, than anything else shown in the art as it was known in 1922.

How far it may be said that the disclosure in a foreign patent must be clearer if anything than that in an American patent to establish anticipation is perhaps somewhat in doubt in this circuit. See Trussell Mfg. Co. v. Wilson-Jones Co. (C. C. A.) 50 F.(2d) 1027 at page 1029, where it is said:

"This disclosure is not sufficiently clear to satisfy the rule already mentioned. Indeed, it has been urged that that rule must be applied more strictly to foreign than

to domestic patents. Much may be found in the books which seems to support such a distinction. See Seymour v. Osborne, 11 Wall. 516, 555, 20 L. Ed. 33; Hanifen v. E. H. Godshalk Co., 84 F. 649, 651 (C. C. A. 3); In re Ek, 57 App. D. C. 203, 19 F.(2d) 677, 678. However, we see little basis for it. An inventor is charged with knowledge of whatever the prior art discloses, but the disclosure, to be an anticipation, must be clear and certain. Why it need be more clear in a foreign patent than domestic one, we confess is not obvious to us. But we need not now determine whether the distinction is too firmly established to be disregarded. We mention it merely by way of a caveat."

Within the language quoted, it is thought that Henin fails entirely to disclose a mental concept that may be fairly held to have been prior to Snyder; he was describing an agitator to function in a corrugated tub, which suggests the rubbing of clothes against the corrugations to produce thread deformation. He provided means, not to promote that deformation through the action and counter action of opposed currents of water, but a perforated disc upon which the fabrics would not mat, but he does not disclose why or how that result is produced.

There is nothing in the recital consistent with a purpose to produce cleansing effects save by the battering of fabrics against the corrugated walls of the tub, and in the absence of a statement by the patentee that he contemplated something other than that, it is believed that Snyder is entitled to be judged on the merits of his own disclosure, so far as Henin is concerned.

Nor is it the Henin model which the accused machines embody.

### French Patent Versaille, No. 398,798 (1909).

This machine involves a tub having non-corrugated sides, and an agitator shaped like a spool, which rotates in alternate directions. Between the upper and lower plates of the agitator, which is as high as the tub is deep, "are radially mounted a series of blades adapted to whip constantly the articles to be washed by projecting them against the side walls of the tub." Later it is said: "In turning, the agitator blades drive the articles to be washed laterally into frictional engagement with the tub wall, from which they rebound toward the agitator. In that way a continuous friction is produced which results in a perfect washing action, with the expenditure of a minimum of physical exertion."

In paragraph 3 of the summary, in referring to this action, it is said that the articles "are acted upon between the agitator and the tub."

Enough has been quoted, it is supposed, to indicate that this patentee's conception was almost precisely unlike that of Snyder.

Whether the machine could be manipulated so as to produce in the lower half of the tub, a water flow comparable to that of the Maytag machine, scarcely touches the issue of anticipation. Versaille depended upon thrusting the fabrics against the sides of the tub, as he said repeatedly. He taught nothing of thread deformation through water action.

This machine also was available to the manufacturers of the accused devices, when they put out their under-water impeller type machines, but without perceptible effect thereon.

### Miller, No. 738,560 (1903).

The defendant offered in evidence two machines built by Miller, apparently between 1915 and 1920. The plaintiff offered the patent in rebuttal. The latter teaches an overhead floating dolly which cooperates with the ribs on the side and bottom of the tub. The specification says, "The rubbing is effected by the action of the side and bottom ribs of the agitator in conjunction with the side and bottom ribs of the tub, and this rubbing in connection with the rush of the water as the agitator is turned within the tub and the squeezing action effected by the up and down movement of the agitator is designed to cleanse the articles in the tub in a satisfactory manner."

The agitator ribs are comparatively large in order to better serve their purpose in moving the water and the clothes. The claims are appropriate to the disclosure.

The late abandonment by Miller of ribs in the tub, as shown in Defendant's Exhibit 22, was thought not to affect washing results. This departure perhaps brought the Miller machines into similarity with the teachings of Davis patent No. 1,240,826, but that would not establish anticipation of Snyder.

### Mills, No. 1,118,210 (1914).

This is a patent relating to gearing in washing machines. On that subject it is quite specific. A bladed agitator is shown in bottom position of the tub, and the only reference thereto in the specifications describes their construction. The claims assert nothing concerning the agitator, or what it accomplishes. Defendant's witness Geldhof, the practical designer of the Easy Company, said that such an agitator was harmful in its operations with respect to fabrics being washed, and that he would avoid such a device at all hazards. Certainly Mills revealed nothing in advance of Snyder, except perhaps a warning of something to avoid.

### Covell, No. 95,565 (1869).

This patent is of interest largely because the inventor visualized washing by water action alone, although he provided vertical ribs for his cylindrical shaped tub. The agitator is at the bottom, and is rotated manually from the top, by a shaft running through a sleeve maintaining it in a fixed position "thus preventing the tendency of the clothing to follow the current of the water, and to become wound around the shaft during its revolution."

The agitator has beveled radial blades, to generate upward movement of the water, and attached to them, or the upper side of the disc, horizontal thimbles or funnels to form horizontal currents.

' The defendant's expert, Prof. Taggart, attributes to the patentee the conception of suspending the fabrics, but Covell does not say so. The witness gives it as his opinion that washing was done by pounding, scrubbing and dragging, from which it is fair to deduce that the ribs of the tubs served the office of opposing the fabrics, rather than the water currents.

No one asserts that Covell's machine has been operated, so that it is impossible to tell whether clothes could be washed in it.

The most that can be said for it is that this inventor had the same end in view, as did Snyder, and the defendant asserts that he did not succeed, and that therefore Snyder must be assumed also to have failed.

Covell did anticipate Snyder in his ambition, but nothing that he teaches concerning his solution of the problem, constitutes tuition which Snyder is shown to have embraced.

### Ritz, No. 1,393,969 (1921).

This patent discloses a discless agitator having three radial blades equally spaced, and intermediate triangular members. It is shown at the bottom of a corrugated tub, and oscillates on a vertical shaft the movement of which is demonstrated. As the agitator oscillates about 180° "the clothes rub against the corrugated side of the tub, and the agitator is free to follow the path of least resistance and to move up and down its sleeve 20 thereby overcoming the wear and tear frequently experienced in machines of this type."

The claims are concerned with the agitator only, the office which it performs being stated as quoted from the specification.

The distinction between this patent and Snyder is too clear to require discussion.

### Groat, No. 113,762 (1871).

This patent covers the form of bottom-positioned agitator or impeller, manually oscillated, which the inventor believed capable of functioning so as to cause water to dash up from below the disc containing the ribs, through openings therein provided for that purpose. Such upward impelled jets or currents were struck by the ribs and dashed against and through the fabrics, and "at the same time the ribs D will operate to rub and turn the articles and agitate the water violently above the wheel."

The upward thrust of the water was said to be caused by a web construction beneath the agitator.

The patentee uses the term "beater" as synonymous with "ribs."

This is another example of an earlier effort than Snyder's, to construct a water-action washer. There is no testimony as to the success or lack of it, which attended the effort.

Once the distinction is grasped, between intention and accomplishment, as revealed in these several patents, it becomes apparent that the presence of the former, does not establish anticipation of the latter.

Perhaps all the patents which have been discussed could have been disposed of by that remark, but they have been referred to herein perhaps at tedious length, so that it may be known that the defendant's contentions in respect of them, have undergone examination.

The other patents referred to fall within the general category of unsuccessful efforts to accomplish the cleansing of fabrics mainly by water action. However impressive the list of failures may be, taken in the aggregate, it does not follow that Snyder's patent is for that reason to be relegated to the limbo of futility.

In 1922 the art contained under-water impellers having blades, and the means to agitate them; smooth and corrugated tubs, and several announcements that these elements could be associated and operated so as to wash clothes by water action. What it did not contain was a machine that accomplished that purpose.

■ It is next asserted that the specifications of the Snyder patent are not sufficiently "full, clear, concise and exact" within statutory requirements (R. S. § 4888, 35 U. S. C. § 33 [35 USCA § 33]) to achieve validity.

The alleged obscurity has not proven an insurmountable obstacle to the manufacturers of the machines sold by the defendant.

Those manufacturers are of course members of the public who are entitled to be informed of the dimensions of the invention.

Truly the criticised expressions are not precise, such as the reference to the blades as having *substantial* height and area; and the spacing of the impeller as *substantially* distant from the walls of the tub; and the impeller's requirement of *rapid* reciprocation, in order that water may be forced *violently* outward and the like. It must be remembered that the operation being described is not easily to be followed in the visual sense, and hence does not lend itself to precise portrayal. This case with its mass of testimony and exhibits, presents an impressive array of controversy concerning what actually takes place within the machine during operations, and it is thought that the specifications must be viewed with tolerance in the light of that circumstance.

The importance of the relation, for instance, between the respective diameters of the impeller and the tub, is a matter of dispute within the defendant's camp; the evidence for the plaintiff is harmonious on that issue, perhaps because but one witness testified on the subject.

The drawings forming a part of the application have not been criticised, and when read with the recitals it cannot be said that the patentee failed to lay bare his concept, and the way in which he embodied it, with sufficient definition to apprise the public and those possessing the conventionally denominated skill, of the metes and bounds of the invention.

A claim comparable to 26 and 38 here involved, was before the court in Smith v. Snow, 294 U. S. 1, 55 S. Ct. 279, 79 L. Ed. 721, in which the patent was held valid and infringed.

The defendant's expert defined "substantial suspension" occurring in Claim 26 and elsewhere as meaning "that the material is in water and not making any contact with the agitator that will result in deformation of the threads and cleansing by reason of such deformation."

That definition may be accepted. It accords with what the court thinks it observed, namely, that the contacts between the fabrics and the impeller were not of sufficient force to batter the fabrics so as to cause thread deformation.

The defendant has failed to demonstrate, however, that thread deformation does not occur as an incident to the torsional stress to which the fabrics are subjected while encountering the various water currents set in motion by the impeller, and while the fabrics are thereby thrust against and rubbed upon each other.

That the expressions "substantial contacts" and "substantial suspension" thus have a clear meaning to one skilled in the art, follows from the fact that the defendant's expert furnished the definition, which seems to meet the reasonable requirements of the statute with reference to this patent.

■ Before leaving this argument it may be said that it is thought that there is no requirement for specifying the load of clothes that could be conveniently handled in the plaintiff's machine.

Idiosyncrasies of individual technique, raiment, water (with respect to hardness), the degree of soil and its character, and the size and texture of the articles to be cleansed, all have a place in such a matter. Overloading is a mere matter of experience and observation.

■ The speed of oscillation could scarcely be more important in the Snyder patent than the velocity of the air current in the Smith incubator-supra; so long as the patentee asserted the requirement of

sufficient speed to accomplish the definite object stated, it is thought he has made the kind of disclosure that the law requires.

There is a considerable volume of testimony, and much argument in the briefs, concerning actual priority of invention, assuming that such is present in the case, as between Alpheus W. Altorfer of Altorfer Bros., now the A. B. C., and Snyder.

That question was imported into the case shortly before hearing, by the decision of an interference proceeding, Altorfer v. Haag, reported in (Cust. & Pat. App.) 74 F.(2d) 129, 134 under date of December 24, 1934.

Altorfer's patent covers a washing machine comprised of a tub, the bottom of which is pierced by a vertical shaft drive, to which is affixed an under-water agitator comprising a disc the rim being spaced "a substantial distance from the wall of the tub" (an expression to which the defendant does not except for lack of exactness), a sleeve projecting up from the disc to a drive shaft with which it is connected.

Altorfer filed May 21, 1925, and Haag had done so on July 25, 1924. An interference was declared, and the final decision was in Altorfer's favor, on the theory that he preceded Haag. Thus:

"We are of the opinion that the record shows that Altorfer had fully reduced his invention to practice by the spring of 1921, or in any event had done so before Haag had entered the field, and that the record does not disclose facts which indicate that Altorfer abandoned his invention, or that he ever suppressed or concealed the same in such a way as to make applicable the doctrine in the case of Mason v. Hepburn, supra [13 App. D. C. 86]. Altorfer's long delay in filing his application after the reduction to practice and his acts subsequent to his reduction to practice do not indicate any intention to abandon the invention, but, on the contrary, his subsequent acts indicate an intention to utilize and commercialize the invention at a date dependent upon the result of tests and upon other considerations which we think were wholly reasonable and proper under the circumstances for him to take into consideration."

The defendant cites this decision as establishing Altorfer's invention date as four years earlier than his filing, and argues that Snyder is thus anticipated.

The case is an adjudication as between the parties only, and for the purpose of establishing priority as between them. It was not necessary for the court to award Altorfer any date prior to August of 1923, for the record apparently showed conception by Haag in September of that year.

As between these parties, the decision quoted, although commanding the greatest respect, is deemed not to be controlling as to what Altorfer says he did in 1921. The testimony at bar has been carefully considered, and yields the distinct impression that in 1923 when the Altorfer Company acquired a Maytag machine, for the information of its engineering and designing department, Mr. Altorfer was reminded that he had conducted some experiments at an earlier date, which might be turned to good account.

It was in 1923 that he requested the witness Schellenberg (his employee) to fix the date of making the agitator, Exhibit 33, which he did by writing "February 1921" thereon, showing that in 1923 the former was concerned to establish a date respecting which there were then said to be in existence certain drawings which have since been mislaid or lost.

The absence of shop records cannot be lightly brushed aside. Altorfer was an experienced patentee; in 1921 he had filed 21 applications touching washing machines, dating as far back as 1909.

It is difficult to conclude that in 1921 he did not understand the necessity for making and keeping shop records and notes in order to establish through them, such important matters as the dates of conception and reduction to practice.

It is not necessary to explore the subject thoroughly, however, for two reasons:

First, it clearly appears that while the Snyder application was pending, Altorfer sought to set up an interference based upon his own 1925 application, and was unsuccessful, because the Patent Office held that neither of the two agitators, Defendant's Exhibits 28 or 33, embodied the Snyder disclosure, when used in the corrugated tub in which they were placed when Altorfer said he made his invention.

Second: Because Altorfer said when testifying in this case, that he had made a study of washing machines for 20 years and had yet to find a method of washing clothes that "did not embody the mechanical rubbing or flexing of the agitating

means (namely, the impeller or agitator) on the clothes"—that the water movements do not have a material washing action on the clothes—there is not enough power generated to cause much washing action.

He repeated this in substance with specific reference to Defendant's Exhibit 33, and its rubbing of clothes against the corrugations of the tub. This testimony had to do with his own machine and if he believed it, he thereby confirmed the Patent Office view above recited.

As a matter of reason, the Altorfer asserted invention cannot be thought to anticipate Snyder, if the former says that his application does not purport to describe a washing machine which operates in the way that Snyder claims for his structure, and it is therefore unnecessary to attempt to fix a date for Altorfer's conception. If it were, the evidence would be deemed insufficient to show more than desultory experimenting prior to the acquisition by Altorfer Brothers, of the Maytag machine in 1923.

If it were essential to fix the date of Snyder's disclosure of his invention, the testimony of Mr. Mason would be relied upon as to January 21, 1921. The reduction to practice preceded that by a matter of months. It is not deemed necessary to fix the date, because the evidence fails to establish anticipation, but the subject is referred to because much is made of the undisputed fact that the Snyder impeller in its early form, was operated in a corrugated tub, while the new device was being tested.

This was not a matter of choice. The only tub available during 1919 and 1920 was of the corrugated type, since that kind of tub was being manufactured and sold by the Maytag Company. That tub was not satisfactory in Snyder's opinion, to render his purposes effective, and this explains his change to the smooth walled tub. The narrative is consistent with the development of concept recited in the specifications, page 1, line 62, page 2, line 29, and in certain of the claims.

■ The defendant argues that the claims in suit should be limited to the dish-shaped disc, clearly shown in the drawings, Figs. 4 and 5, of the Snyder patent, and described at page 3, line 55 and 94, as follows:

"The gyrator is metal, or other suitable material, and is of generally circular form when viewed in plan. It comprises an annular, trough-like or dish-shaped portion 54, the central or inner portion of which merges in a continuous concave curve into a central upstanding stem portion 53 which tapers upwardly and terminates in an upper rounded end. The outer peripheral edge of the trough-like portion 54 extends outwardly and upwardly in a concave curve 55 which is continuous with the dished curve of the portion 54. The gyrator is provided with liquid impelling means, one form and arrangement of which is illustrated in the drawings.
* * *

"As shown in Fig. 4, the blades extend across the dish-shaped member at the lower ends in lobe-shaped form and the upper surfaces of the wings or blades extend considerably above the dish-shaped member to provide sufficient blade surface to impart a considerable force or throw to the water in the direction outwardly and somewhat parallel to the axis of rotation of the gyrator, as hereinbefore described. It is to be noted that the outer inclined portion 55 of the dish-shaped member assists in this movement and that this directional flow is augmented by the inclined walls 48 of the surrounding trough or tub. The force imparted to the water is sufficient to cause the water to flow upwardly toward the top of the tub, as shown in dotted lines, Fig. 1."

The claims are preceded by the customary paragraph reserving the right to depart from the specific description of structure, etc.

From what has been quoted above it appears that Snyder taught sufficient blade surface to impart outward force or throw of water and that this was assisted by the dish-shaped disc. Many claims not in suit specify that form of disc. Claim 23 does not, in terms or by implication. The reference to the "adjacent portion of the impeller base" means the inner portion as well as that near the rim.

The same is true of Claim 26.

In other words, these claims are in harmony with the invention as described in the specification, and the disclosure of the latter was sufficiently broad to support a claim which did not embrace a dish-shaped disc exclusively, but a flat disc was equally within the conception as stated.

Claim 38 is assailed in that it is said to express only the function of the Maytag machine, and to be invalid as a method

758

claim for that reason. The criticism is not without reason, for the flow of water and the opposing currents elsewhere are said to be created in the Maytag machine. The issue is close and may well develop a conflict of opinion.

To this court it seems that the method described involved thread deformation as forecast in the specifications, page 5, line 25, and that such accomplishment by the pressure and interplay of contending currents was something not taught by Snyder's predecessors in this field. The substantial suspension of course was not a suspension at rest, but a movement which did not involve the kind of forceful contact with either impeller or tub which would effect thread deformation.

■ If that is true, the method is novel. If it can be accomplished in any other machine than the Maytag, then in the language of Waxham v. Smith, 294 U. S. 20, at page 22, 55 S. Ct. 277, 278, 79 L. Ed. 733, "A method, which may be patented irrespective of the particular form of the mechanism which may be availed of for carrying it into operation, is not to be rejected as 'functional' merely because the specifications show a machine capable of using it [citing cases]."

There is no testimony to the effect that the method as stated in this claim could not be practiced in a machine of another design, which is not a cause for wonder since defendant's main position is that it cannot be done in any machine.

Lacking such proof, the claim will not be held invalid.

■ The Snyder patent was pending from June 14, 1922, until July 12, 1932, and the file wrapper is a formidable document in volume and content. Defendant criticises the claims in suit as having been proposed March 31st, 1932, two years after the Easy machine, and four years after those of the A. B. C. were on the market and relies upon several decisions in this circuit to defeat these claims for laches and on the grounds of estoppel, citing cases; these have been examined.

It must be made to appear that these claims introduced new matter and broadened the invention as stated, in order that the said decisions may be invoked by the defendant.

As to Claim 38, the method, it appears that this point was considered in the interference proceedings of Unruh v. Snyder, etc., 49 F.(2d) 1038, which went to the Court of Customs and Patent Appeals, and measurably delayed the issuance of the Synder patent. It there appeared that Snyder's method claim was filed in July, 1924, more than two years after the application.

That was Claim 1, reading as follows:

"1. The method of cleansing fabrics in a tub consisting in agitating a washing fluid in such a way as to create positively driven violently flowing currents moving away from and back to the plane of the source of agitation, and also around the tub in one direction in a plane approximately parallel with the plane of agitation and then causing it to move away from and back to the plane of the source of agitation and in a reverse direction in a plane parallel with the plane of agitation so as to bodily and forcibly cause the fabrics in the tub to travel in substantially the same paths as the fluid, whereby thorough cleansing of the fabrics is effected without material contact with rubbing surfaces."

With respect to the delay the court said that the two-year delay did not defeat Snyder's right to make the claim, because the original disclosure was sufficient to sustain it. While that decision is not controlling in this cause, it is an authority which may be followed without misgiving.

The quoted verbiage is different from that of Claim 38, but the same method or process is thought to be equally embodied in both.

Claims 23 and 26 are not shown to embody any expansion of concept beyond many of those stated in the original application. If this contention had been greatly relied upon, something in the way of an analysis of the file wrapper would have been presented to indicate the advent in the process of solicitation of the alleged new and larger concept; something that could be related in point of time, to an influential exterior development in the industry or the art.

In the absence of such data, the court has relied upon its own efforts to detect in these claims, anything in extension of the assertions in the application, but without success.

Having in view all that attended the prosecution of this patent, it is thought that mere lapse of time in the formulation of these claims, ought not to count against

them, when it is considered that they merely restate in essence that which was presented for allowance in June, 1922.

Whether the prosecution of the application was as diligent as circumstances would have permitted is difficult of determination, in the absence of insight which this court plainly lacks. It is necessary to take the record as it is found, and unless something inequitable in the plaintiff's cause can be directly traced to the duration of the proceedings in the Patent Office, or the incidents thereof, it is not apparent that the plaintiff's presumptive rights have been impaired.

As was earlier observed, the question of infringement is not difficult. The only argument advanced to avoid it, is that the dish-shaped impeller is vital to the Snyder patent, and as the accused machines have flat discs, they must be held not to infringe. It is not thought that the Snyder patent is so restricted, in either its narrative or in Claims 23 and 26, and that the flat disc is equally within its scope.

From what has been said, which necessarily omits reference to much that appears in the testimony, it follows that in the view of this court the defendant has not demonstrated invalidity of the Snyder patent, and that infringement has been shown on the part of each of the accused machines.

The plaintiff may have a decree for injunction and an accounting, to be settled; submit proposed findings in accordance herewith, on notice.